**2020 UT App 13**

# THE UTAH COURT OF APPEALS

HEARTWOOD HOME HEALTH & HOSPICE LLC,
Appellant,

*v.*

RITA HUBER AND GLENNA MOLYNEUX,
Appellees.

Opinion
No. 20170221-CA
Filed January 24, 2020

Third District Court, Salt Lake Department
The Honorable John Paul Kennedy
No. 120907379

Gary R. Guelker and Janet I. Jenson, Attorneys
for Appellant

Robert H. Wilde and Michael S. Wilde, Attorneys
for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

ORME, Judge:

¶1    Heartwood Home Health & Hospice LLC (Heartwood) appeals the district court's grant of summary judgment in favor of Rita Huber and Glenna Molyneux (collectively, Defendants), and the court's imposition of sanctions against it pursuant to rule 11 of the Utah Rules of Civil Procedure. We affirm the district court's grant of summary judgment but reverse its imposition of sanctions.

BACKGROUND[1]

¶2    Heartwood "is a licensed home health care agency and hospice that offers care to elderly and homebound patients." Defendants are Heartwood's former employees. Huber held the position of nurse care manager and "was responsible for coordinating her patients' care with Heartwood's physicians, social workers and home health aides." Molyneux was employed as a home health aide at Heartwood. She provided personal, at-home care to patients, which included bathing, meal preparation, and minor housekeeping.

¶3    As a condition of their employment by Heartwood, Defendants signed a "Confidentiality/Non-Disclosure Agreement" (the Confidentiality Agreement), which included this provision:

> Knowledge of employees and patients is specifically the privilege of your employment here. If your employment should end with [Heartwood], you are prohibited to contact any employee, patient, or other professional relationship that you have that was a result of being an employee of [Heartwood].[2]

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

2. Heartwood has not directed us to, nor have we succeeded in locating, the Confidentiality Agreement in the record. The only portion of the agreement that we have the benefit of examining is that which we have quoted above.

¶4 In August 2012, Huber left Heartwood for a position with one of its competitors, Good Shepherd Home Care & Hospice, Inc. (Good Shepherd). In the weeks following her departure, Huber met with Molyneux and Heartwood's director of nursing (Director) for lunch. In October 2012, Director accepted a position at Good Shepherd, and Molyneux followed suit approximately one week later.

¶5 In the four days following Molyneux's departure, four of her Heartwood patients transferred to Good Shepherd. Believing that Good Shepherd was poaching its patients,[3] Heartwood sent

---

3. In its opening brief, Heartwood describes three instances that led it to believe that Director and Molyneux were soliciting its patients on Good Shepherd's behalf. These instances occurred either in the week between Director's and Molyneux's resignations or just after Molyneux resigned. First, one of Heartwood's nursing aides reported encountering Director and Molyneux at a patient's home wearing Good Shepherd uniforms. Allegedly, the two quickly departed, but left a Good Shepherd business card and refrigerator magnet behind with the patient. Second, Heartwood's chaplain reported that a patient had informed him that Director and Molyneux had attempted to persuade her to transfer to Good Shepherd. Third, the chaplain claimed to have witnessed a Good Shepherd van leaving the home of another Heartwood patient. All three of these patients who were allegedly solicited by Director and Molyneux remained with Heartwood.

Heartwood presented this information to the district court for the first time in its attorney's affidavit attached to its opposition to Defendants' motion for sanctions, which Heartwood filed one week after the court granted summary judgment to Defendants. The information was not before the court for consideration on Defendants' motion for summary judgment. Furthermore, record "evidence" of these instances is limited to the attorney's affidavit, which constitutes inadmissible hearsay. *See* Utah R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or

(continued…)

a cease and desist letter to Good Shepherd, requesting that it advise Defendants and Director to stop contacting Heartwood's patients and staff. The following day, another of Molyneux's former patients transferred to Good Shepherd. On the heels of that fifth transfer, Heartwood initiated suit against Defendants, Director, and Good Shepherd.[4] After Heartwood filed its complaint, the flow—or perhaps trickle—of patients from Heartwood to Good Shepherd ceased, with the exception of one other patient of Molyneux's who transferred to Good Shepherd approximately one week later.

¶6      In relevant part,[5] Heartwood's complaint alleged that Huber convinced Director and Molyneux to leave Heartwood's

---

(…continued)

oppose a motion [for summary judgment] must be made on personal knowledge, must set out facts that would be admissible in evidence, and must show that the affiant or declarant is competent to testify on the matters stated."). Heartwood had not submitted affidavits from the nursing aide or chaplain, and the record shows that Heartwood made the conscious decision not to depose or seek affidavits from any of the patients that either transferred to Good Shepherd or chose to remain with Heartwood.

4. Director and Good Shepherd are not parties to this appeal. Neither joined Defendants' motion for summary judgment or motion for sanctions, which are the subjects of this appeal. Additionally, Director has since passed away, and the district court entered default judgment against Good Shepherd in the amount of $130,000 following its failure to appear. Accordingly, except where necessary to better understand Heartwood's claims against Defendants, we have omitted discussion of Heartwood's claims and allegations against Director and Good Shepherd.

5. Heartwood narrowed its allegations against Defendants at the summary judgment stage of the proceedings.

employ in favor of Good Shepherd and that Molyneux in turn solicited Heartwood's patients on Good Shepherd's behalf. Based on these assertions, Heartwood sued Defendants for (1) breach of the Confidentiality Agreement, (2) breach of the duty of loyalty, (3) breach of the duty of confidentiality, and (4) intentional interference with contractual relations.

¶7    Near the end of discovery, Defendants sought to depose Heartwood's corporate representative pursuant to rule 30(b)(6) of the Utah Rules of Civil Procedure.[6] Heartwood designated its owner, Lee Vasic, to testify on its behalf. At the 30(b)(6) deposition, when asked how he had prepared, Vasic replied that he re-read the complaint and generally discussed what a deposition was with Heartwood's attorney. Although he acknowledged receiving the list of topics Defendants intended to discuss during the deposition, he did not review Defendants' depositions nor did he discuss the deposition topics with any current or former Heartwood employee in preparation for the deposition.

¶8    In view of Vasic's deposition testimony, Defendants served Heartwood with a motion for sanctions pursuant to rule 11 of the Utah Rules of Civil Procedure, contending that Heartwood's complaint lacked factual support. Heartwood declined to withdraw its complaint, and after the 21-day safe harbor period had passed, *see* Utah R. Civ. P. 11(c)(1)(A), Defendants filed a motion for sanctions with the district court in

---

6. The rule permits a party to depose "a corporation, a partnership, an association, or a governmental agency" by allowing the organization to designate one or more representatives to "testify as to matters known or reasonably available to the organization." Utah R. Civ. P. 30(b)(6). *See infra* ¶¶ 16–20.

conjunction with a motion for summary judgment.[7] The district court stayed further briefing on Defendants' motion for sanctions until after its resolution of their summary judgment motion.

¶9    Following a hearing, the district court granted Defendants' motion for summary judgment. Among other things, the court essentially held Heartwood to Vasic's rule 30(b)(6) testimony and concluded that it had "not produce[d] evidence establishing all of the elements of any of its claims [against Defendants] and has accordingly not met its burden on summary judgment."

¶10    The parties subsequently resumed briefing on Defendants' motion for sanctions. The district court likewise granted that motion and ordered Heartwood to pay "Defendants for their reasonable attorney fees in defending the claims after it became clear that the claims lacked evidentiary support and legal basis." The court later determined that amount to be $10,528.50, which reimbursed Defendants "for their reasonable attorney fees in bringing the motion for summary judgment and motion for sanctions." Heartwood appeals the court's grant of both motions.[8]

---

7. The motion for summary judgment was brought after the parties had completed nearly a year's worth of discovery. Heartwood did not move the district court, pursuant to rule 56(f) of the 2014 version of the Utah Rules of Civil Procedure, to stay its decision on Defendants' summary judgment motion in order for Heartwood to conduct additional discovery. *See* Utah R. Civ. P. 56(f) (2014). *See also id.* R. 56(d) (2019).

8. This is Heartwood's second appeal on the sanctions issue. *See Heartwood Home Health & Hospice LLC v. Huber*, 2016 UT App 183, 382 P.3d 1074. We dismissed Heartwood's first appeal on the ground that a final judgment had not yet been issued in the case,

(continued…)

ISSUES AND STANDARDS OF REVIEW

¶11    Heartwood challenges the district court's grant of summary judgment in Defendants' favor. We "review[] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, . . . view[ing] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (quotation simplified).

¶12    Heartwood also challenges the district court's imposition of rule 11 sanctions against it. We apply a "three-part approach" in reviewing a district court's decision to impose sanctions. *Archuleta v. Galetka*, 2008 UT 76, ¶ 6, 197 P.3d 650. The court's "[f]indings of fact are reviewed under a clear error standard," its "conclusions of law are reviewed for correctness," and its "determination regarding the type and amount of sanctions to be imposed is reviewed for abuse of discretion." *Id.*

ANALYSIS

I. Summary Judgment

¶13    Summary judgment is appropriate when (1) "there is no genuine dispute as to any material fact" and (2) "the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We now turn to consider each of these requirements.

A.    Dispute as to Any Material Fact

¶14    In reviewing a district court's grant of summary judgment, we first determine whether a dispute as to any

_____

(…continued)
rendering the appeal premature and thereby depriving us of appellate jurisdiction. *See id.* ¶ 13.

material fact exists by asking "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Clegg v. Wasatch County*, 2010 UT 5, ¶ 15, 227 P.3d 1243. A genuine dispute as to material facts may exist even when the parties agree on the objective facts, but disagree as to the reasonable inferences that can be drawn from them regarding "the understanding, intention, and consequences of those facts." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶¶ 32–33, 235 P.3d 749 (quotation simplified). But if there can "be no reasonable difference of opinion on a question of fact in light of the available evidence, the decision is one of law for the trial judge or for an appellate court." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified).

¶15    Heartwood asserts that the objective facts of this case and the reasonable inferences drawn therefrom precluded summary judgment because they "created a genuine issue of fact as to whether [Defendants] had contacted Heartwood's patients and employees in an effort to have them switch their medical care or employment over to [Defendants'] new employer, Good Shepherd." Although Heartwood points to circumstantial evidence that it argues supports this assertion, it is not entitled to rely on much of that evidence in light of the concessions Vasic made during his rule 30(b)(6) deposition.

¶16    Rule 30(b)(6) of the Utah Rules of Civil Procedure prescribes a method for deposing organizations. Its federal counterpart—upon which the Utah rule is based—was designed, among other things, to avoid the "wasteful charade in which the deposing party attempt[s] to guess the appropriate person to provide the information sought and the entity remain[s] silent as to the identity of persons who could actually provide useful testimony," and "to curb 'bandying' by which corporate employees each disclaim knowledge of facts known to [the]

organization." 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.25[1] & n.2 (3d ed. 2018).[9]

¶17    Rule 30(b)(6) depositions are noticed to the organization rather than to any particular individual. *See* Utah R. Civ. P. 30(b)(6). Unlike ordinary depositions, a rule 30(b)(6) deposition notice must "describe with reasonable particularity the matters on which questioning is requested." *Id.* The purpose of this requirement "is to enable the responding organization to identify the person who is best situated to answer questions about the matter." 8A Charles Alan Wright et al., *Federal Practice & Procedure* § 2103 (3d ed. 2019). The organization is then obliged to produce one or more representatives who are prepared to testify on its behalf concerning the matters described in the notice that are "known or reasonably available to the organization." Utah R. Civ. P. 30(b)(6). *See also* 8A Wright et al., *Federal Practice & Procedure* § 2103 ("[U]nlike all other depositions, there is an implicit obligation to prepare the [rule 30(b)(6)] witness."). This "duty extends not only to facts, but also to [the organization's] subjective beliefs and opinions." 7 Moore, *Moore's Federal Practice* § 30.25[3]. "Thus, the rule requires a good faith effort to find out the relevant facts, which may [include] collecting information, reviewing documents, and interviewing employees with personal knowledge." *Id.* The rule does not require the representatives to have personal knowledge regarding the subject matter of the deposition. *Id.*

¶18    Due to the organization's affirmative duty to adequately prepare its representative to address the topics within the scope of the deposition notice, the organization is generally bound by its representative's testimony at the summary judgment stage of

---

9. "Interpretations of the Federal Rules of Civil Procedure are persuasive where, as here, the Utah Rules of Civil Procedure are substantially similar to the federal rules." *Supernova Media, Inc. v. Pia Anderson Dorius Reynard & Moss, LLC*, 2013 UT 7, ¶ 40 n.8, 297 P.3d 599 (quotation simplified).

litigation. *Id.* The organization therefore may not, without good reason, present facts that fall within the scope of the deposition notice that contradict those articulated by the rule 30(b)(6) representative, or facts that the representative professed not to know, to defeat a motion for summary judgment.[10] *Id. Cf. id.* ("[P]roducing an unprepared witness is tantamount to a failure to appear, also warranting sanctions pursuant to Rule 37(d)."); Utah R. Civ. P. 37(d) (stating that if the rule 30(b)(6) representative "fails to appear before the officer taking the deposition after service of the notice, any other party may file a motion for sanctions under" rule 37(b), which authorizes the sanctioning court, among other things, to prohibit the party from introducing certain evidence); *Burns v. Board of County Comm'rs*, 330 F.3d 1275, 1282 (10th Cir. 2003) ("[Rule 30(e) of the Federal Rules of Civil Procedure] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. . . . A deposition is not a take home examination.") (quotation simplified); *Anderton v. Boren*, 2017 UT App 232, ¶ 20, 414 P.3d 508 ("The general rule in Utah is that an affiant may not raise an issue of fact by his own affidavit," filed in opposition to a motion for summary judgment, "which contradicts his deposition, unless he can provide an explanation of the discrepancy.") (quotation simplified).

¶19   Although the duty to produce and prepare a witness may prove burdensome to a corporation, it "is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business."

---

10. The representative may modify the rule 30(b)(6) deposition testimony within the 28-day period permitted by rule 30(e) of the Utah Rules of Civil Procedure, if the modification is accompanied by a reasonable explanation for the material discrepancy. *See* Utah R. Civ. P. 30(e); *Gaw v. Department of Transp.*, 798 P.2d 1130, 1139–41 (Utah Ct. App. 1990).

*United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996). Moreover, "[t]his interpretation is necessary in order to make the [rule 30(b)(6)] deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial." *Id.*

¶20　The binding nature of the representative's deposition, however, is limited to the summary judgment stage and, even then, the evidentiary limitation does not extend to the representative's legal conclusions; to answers to questions that do not fall within the noticed scope of the deposition; or to facts that supplement, correct, or explain the representative's testimony. *See Gaw v. Department of Transp.*, 798 P.2d 1130, 1139–41 (Utah Ct. App. 1990); 7 Moore, *Moore's Federal Practice* § 30.25[3].

¶21　In opposition to Defendants' motion for summary judgment, Heartwood stated that although it did not have direct evidence to support its allegation that Molyneux[11] recruited Heartwood's patients before she left its employ,[12] there was

---

11. Although Vasic also made statements that contradicted some of Heartwood's allegations against Huber, we do not discuss them in this section because they are not relevant in evaluating the district court's grant of summary judgment in Huber's favor. As discussed in more detail in section IB, Heartwood's factual allegations are relevant only to its claims for breach of contract and breach of the duty of loyalty. Because Heartwood did not supply the Confidentiality Agreement in the record on appeal, we are precluded from addressing Heartwood's breach-of-contract claims against Defendants. *See infra* ¶ 26. And Heartwood abandoned its breach-of-the-duty-of-loyalty claim against Huber. *See infra* ¶ 27 n.14.

12. The timing of Molyneux's alleged solicitation of Heartwood's patients is relevant because Heartwood could prevail on its

(continued…)

circumstantial evidence "which, when viewed in the light most favorable to Heartwood, creates a strong inference" in support of that assertion. Heartwood pointed to the undisputed fact that six of its patients, all of whom had been assigned to Molyneux, began transferring to Good Shepherd during her final week at Heartwood. During the rule 30(b)(6) deposition, Vasic stated that when he asked the patients for the reason they were transferring, they answered, "Because we hear [Molyneux is] leaving." Heartwood argues that "[i]t is unclear how these individuals would have even known that Ms. Molyneux was leaving unless she informed them of the fact." Additionally, Heartwood points to documentation in which four of the six patients who moved to Good Shepherd listed Molyneux as their referral source.

¶22    But Vasic's rule 30(b)(6) testimony concerning Molyneux undermines Heartwood's argument that it is entitled to a reasonable inference of allegedly improper solicitation. Although Heartwood asserts that it is otherwise "unclear" how its patients would have known Molyneux was leaving, Vasic's testimony provided the answer to that very question: Vasic himself requested that Molyneux inform her patients of her imminent departure from Heartwood and introduce them to her replacement. He also acknowledged knowing that her patients would probably ask her where she was going.

---

(…continued)
claim against her for breach of the Confidentiality Agreement only if she contacted its patients *after* she left its employ. And Heartwood's claim that Molyneux breached her duty of loyalty to Heartwood would be viable only if she recruited its patients *before* she left Heartwood. *See infra* ¶ 27 & n.14. But, as mentioned in note 11 above, because we cannot meaningfully review Heartwood's breach-of-contract claim and are therefore left with its claim for breach of the duty of loyalty, we focus our analysis in this section on Heartwood's allegation that Molyneux recruited its patients *before* leaving Heartwood.

¶23    Heartwood may have possibly been entitled to an inference of improper solicitation had some of the patients who transferred to Good Shepherd not been Molyneux's former patients. If Heartwood could link the departure of such patients to Molyneux—for instance, if they had named Molyneux as their referral source for transferring to Good Shepherd even though they had not been her patients—then Vasic's request that she inform *her* patients of her impending departure would not have precluded an assumption that she breached her duty of loyalty. But in reality, all six of the patients who transferred had been Molyneux's patients, and Heartwood has presented insufficient evidence to create the reasonable inference that those patients' naming of Molyneux as a referral source was the result of something other than their being informed that Molyneux had resigned from Heartwood in favor of Good Shepherd at the time she introduced her replacement at Heartwood's direction.

¶24    Thus, due to the evidentiary limitations at the summary judgment stage resulting from Vasic's 30(b)(6) testimony, Heartwood presented insufficient evidence to create a "reasonable difference of opinion on a question of fact," leaving "the decision [as] one of law for the trial judge," in the first instance, and for this court on appeal. *See Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). Accordingly, we next proceed to determine whether Defendants were "entitled to judgment as a matter of law" given the facts of record. Utah R. Civ. P. 56(a).

B.    Entitlement to Judgment as a Matter of Law

¶25    A moving party is entitled to judgment as a matter of law when the nonmoving party fails to "set forth facts sufficient to establish the existence of an element essential to that party's case." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 23, 116 P.3d 323 (quotation simplified). Heartwood brought four claims against Defendants: (1) breach of the Confidentiality Agreement, (2) breach of the duty of loyalty, (3) breach of the duty of confidentiality, and (4) intentional interference with contractual

relations. Because Heartwood has not presented facts sufficient to satisfy each essential element of any of those claims, Defendants were entitled to judgment as a matter of law, and the district court properly granted summary judgment in their favor.

1.      Confidentiality Agreement

¶26 Heartwood claims Defendants breached the Confidentiality Agreement, which provided, in relevant part, "If your employment should end with [Heartwood], you are prohibited to contact any employee, patient, or other professional relationship that you have that was a result of being an employee of [Heartwood]." In granting summary judgment on Heartwood's breach-of-contract claim, the district court relied on language within the Confidentiality Agreement that it "construed . . . against [Heartwood] who drafted [it]." *See Edwards & Daniels Architects, Inc. v. Farmers' Props., Inc.*, 865 P.2d 1382, 1386 (Utah Ct. App. 1993). But Heartwood has not included the Confidentiality Agreement—the very contract it asserts Defendants breached—in the record on appeal.[13] The only portion of the agreement that we have the opportunity of examining is that quoted above. Due to this omission, we cannot meaningfully review the district court's interpretation of the agreement, especially because it relied on some provisions that appear nowhere in the record, and we therefore presume that the district court correctly construed the Confidentiality Agreement and granted summary judgment in Defendants'

---

13. Instead, an employee handbook that also included the above-quoted language appears in the record in its entirety. But that document expressly states "that it does not create a contract of employment" and that Heartwood "retains the right to change these policies and benefits, as it deems advisable." The fact that the employee handbook apparently incorporated a few sentences that are identical to those included in the Confidentiality Agreement does not excuse Heartwood from the requirement to provide a full record.

favor on that claim. *See State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 ("When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court.") (quotation simplified); *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct. App. 1989) ("In interpreting a contract, we determine what the parties intended by examining *the entire contract* and all of its parts in relation to each other, giving an objective and reasonable construction to the contract *as a whole*.") (emphasis added).

2.      Duty of Loyalty

¶27     In pressing its claim for breach of the duty of loyalty against Molyneux,[14] Heartwood asserts, relying on *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, 94 P.3d 179, that "Molyneux was still employed by Heartwood when she referred a number of Heartwood's patients to Good Shepherd." Although our Supreme Court did hold in *Prince Yeates* that "an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency," *id.* ¶ 20 (quotation simplified), it did not extend the duty to the circumstance where an employee accepted new employment elsewhere and was followed by his or her clients, *id.* ¶ 24. On the contrary, the Court specifically stated that employees who are unhappy at their places of employment are "free, as . . . at-will employee[s], to leave at any time and presumably take those clients who wished to follow" them. *Id.* Instead, what the Court held to be a violation of that duty was when the defendant "represented clients in the firm's name without disclosing the representation to the firm, expended firm resources and filed pleadings in the firm's name

---

14. Heartwood abandoned this claim against Huber because, according to Heartwood, "[d]iscovery revealed that Ms. Huber solicited Heartwood's employees after she left the company." And Heartwood correctly recognizes that Huber, as a former employee, no longer owed it a duty of loyalty.

in connection with these matters, and retained all fees derived from these cases for himself." *Id.* ¶¶ 19, 24.

¶28 And as previously discussed, Heartwood has not presented sufficient facts to show that the six patients who followed Molyneux to Good Shepherd did so as a result of anything other than discovering that Molyneux was leaving Heartwood in favor of Good Shepherd when Molyneux visited them to introduce her replacement, *per Heartwood's request*. Insofar as Heartwood argues that Molyneux breached the duty of loyalty by notifying her clients of where she had found new employment while introducing her replacement at Heartwood's direction, Heartwood cites no authority to suggest that such action is sufficient to constitute a breach of the duty of loyalty. *See* Utah R. App. P. 24(a)(8); *infra* ¶ 30.

3.      Duty of Confidentiality

¶29 "A former employee may not use confidential information obtained during the course of his or her employment to compete after termination with his or her former employer." *Envirotech Corp. v. Callahan*, 872 P.2d 487, 496 (Utah Ct. App. 1994). In asserting its claims for breach of the duty of confidentiality against Defendants, Heartwood alleges that they "used confidential information they obtained during their employment with Heartwood (the identity of Heartwood's patients and employees) to compete with Heartwood." But Heartwood does not meet its burden of persuasion on this claim.

¶30 Rule 24 of the Utah Rules of Appellate Procedure requires a party to "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). *Accord Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196 ("A party must cite the legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case, including citations to the record where appropriate."). *See also Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d

903 ("An appellate court is not a depository in which a party may dump the burden of argument and research.") (quotation simplified). "An appellant that fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion." *Adamson*, 2017 UT 2, ¶ 13.

¶31  Here, Heartwood has not argued how the identity of its employees and patients constitutes confidential information[15] and has therefore not met its burden of persuasion on appeal.

_____

15. Although Heartwood initially accused Molyneux in its complaint of making copies of confidential patient records prior to leaving, it appears to have abandoned this allegation by the summary judgment stage and does not reassert it on appeal. It follows that Heartwood's claim that Molyneux misused confidential information is limited to her alleged contact with patients with whom she had already developed a direct personal relationship. We therefore decline to conclude, without the benefit of the Confidentiality Agreement in the record before us and in the absence of meaningful argument, that Molyneux misappropriated confidential information by allegedly contacting her own patients after leaving Heartwood, especially in view of several appellate decisions determining that patient lists do not amount to confidential information under certain circumstances. *See, e.g.*, *Vito v. Inman*, 649 S.E.2d 753, 757 (Ga. Ct. App. 2007) (holding that defendant was entitled to summary judgment because plaintiff, a podiatrist, failed to produce evidence that he derived some economic value from the secrecy of his patient list, especially in view of his deposition testimony recognizing that "other podiatrists would not seek to use the list to take his patients from him"); *Dworkin v. Blumenthal*, 551 A.2d 947, 950–51 (Md. Ct. Spec. App. 1989) (concluding that a list of dental patients did not amount to a trade secret because "there [was] no evidence in the record to indicate that an extraordinary amount of effort or money was expended by appellant to generate the patient list," "appellant took no measures to guard

(continued…)

### 4.     Intentional Interference with Contractual Relations

¶32    Finally, Heartwood claims Defendants intentionally interfered with its contractual relations when they allegedly recruited its staff and patients on Good Shepherd's behalf. Our Supreme Court has "been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is *independently tortious or wrongful.*" *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 45, 437 P.3d 343 (emphasis added). In other words, "a person could be held liable for the tort of intentional interference with contract only if the person interfered in a way in which the person was not legally entitled to have interfered," *id.* ¶ 17, "such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession," *id.* ¶ 48.

¶33    Heartwood asserts that Defendants' breach of the duty of confidentiality constituted the requisite "independently tortious" conduct. Because we have determined that Heartwood has not met its burden of persuasion as concerns its claims for breach of the duty of confidentiality against Defendants, it follows that Heartwood has likewise failed to satisfy each of the elements of its intentional-interference-with-contract tort.

¶34    For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Defendants.

## II. Rule 11 Sanctions

¶35    Having determined that the district court properly granted summary judgment in favor of Defendants, we next turn to Heartwood's claim that the court erred in sanctioning it

---

(…continued)
the secrecy of the patient list," and because the departing dentist had a "responsibility . . . to [his] current patients").

pursuant to rule 11 of the Utah Rules of Civil Procedure. "Whether specific conduct amounts to a violation of Rule 11 is a question of law." *Bailey–Allen Co. v. Kurzet*, 945 P.2d 180, 193 (Utah Ct. App. 1997) (quotation simplified).

¶36 "Rule 11 places an affirmative duty on attorneys and litigants to make a reasonable investigation (under the circumstances) of the facts and the law before signing and submitting any pleading, motion, or other paper." *Morse v. Packer*, 2000 UT 86, ¶ 28, 15 P.3d 1021 (quotation simplified). Here, the court determined that Heartwood violated rule 11(b)(3) of the Utah Rules of Civil Procedure, which requires "the allegations and other factual contentions" in "a pleading, written motion, or other paper to the court," to "have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Specifically, in light of Vasic's deposition, the court concluded "that Heartwood violated Rule 11 by failing to withdraw its claims against these Defendants after being served under the safe harbor provision and by continuing to advocate for a position that clearly lacked evidentiary support." And as a result of the perceived violation, the court ordered Heartwood to compensate Defendants "for their reasonable attorney fees incurred litigating their motion for summary judgment and motion for sanctions." *See* Utah R. Civ. P. 11(c) (allowing courts to sanction attorneys or parties for violations of rule 11); *id.* R. 11(c)(2) (permitting courts to impose reasonable attorney fees as a sanction).

¶37 Rule 11(b)(3) "sets a relatively low standard requiring some factual basis after a reasonable inquiry," permitting sanctions against plaintiffs only "for bringing a claim merely founded on innuendo and suspicion." *Robinson v. Morrow*, 2004 UT App 285, ¶ 24 n.3, 99 P.3d 341 (quotation simplified). The standard imposed by rule 11 is lower than that applied at the summary judgment stage of litigation. Thus, although we affirmed the district court's grant of summary judgment in favor of Defendants, that fact alone is insufficient to warrant the

imposition of sanctions against Heartwood.[16] *See Morse*, 2000 UT 86, ¶ 28 ("The fact that a complaint is dismissed for legal insufficiency or does not produce a triable issue does not necessarily mean that a sanction is appropriate.") (quotation simplified). *See also Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68 (3d Cir. 1988) ("Litigants misuse [rule 11] when sanctions are sought against a party or counsel whose only sin was being on the unsuccessful side of a ruling or judgment. Substantially more is required.") (quotation simplified).

¶38　To support its contention that Huber recruited Molyneux and Director on Good Shepherd's behalf, Heartwood offered Huber's deposition testimony in which she acknowledged meeting Molyneux and Director for lunch and sometimes discussing employment opportunities at Good Shepherd with them.[17] And in support of its contention that Molyneux recruited

---

16. Heartwood argues that the district court erred in concluding that Heartwood violated rule 11 by "failing to withdraw its claims against . . . Defendants after being served under the safe harbor provision and by continuing to advocate for a position that clearly lacked evidentiary support," thereby imposing upon Heartwood "an ongoing obligation under Rule 11 to review the sufficiency of its previously filed complaint." Heartwood argues that "Rule 11's emphasis on the need for an attorney to perform a reasonable inquiry before presenting a pleading to the court suggests that the rule authorizes sanctions only for unreasonable filings, not for the failure to amend or withdraw a previously filed document." Because the district court's decision warrants reversal even under an ongoing-obligation interpretation of rule 11, we do not reach this particular issue.

17. But Huber also stated that it was Director and Molyneux who initiated the discussions regarding possible job openings at Good Shepherd.

Heartwood's patients on Good Shepherd's behalf, Heartwood pointed to the following undisputed facts:

- On October 14, 2012, Molyneux tendered her two weeks' notice to Vasic.

- Later that same day, Molyneux submitted an application for employment to Good Shepherd and interviewed with Good Shepherd's director of nursing.

- Either on October 18 or 19, Good Shepherd extended an offer of employment to Molyneux, which she immediately accepted.

- On October 19, two of Molyneux's patients transferred services to Good Shepherd. Two more transferred on October 22, and one more on October 23. And approximately two weeks later, a sixth Molyneux patient transferred to Good Shepherd.

- On October 22, Molyneux began working as a home health aide for Good Shepherd.

- On October 23, Molyneux visited another of Heartwood's patients, Z.H., to inform her that she was no longer employed by Heartwood. Molyneux stated that she visited Z.H. because she had previously been scheduled to do so and she did not want to disappoint Z.H., who was expecting her. She possibly wore Good Shepherd scrubs to that visit. Z.H. remained with Heartwood.

- Four of the six patients that transferred from Heartwood to Good Shepherd listed Molyneux as their referral source.

¶39   It is not readily apparent on the record before us whether Heartwood would have prevailed on the summary judgment motion had it been entitled to any reasonable inference it lost as a result of Vasic's 30(b)(6) deposition. And we cannot say how

we would have ruled had Heartwood included the Confidentiality Agreement in the record and carried its burden of persuasion on the confidentiality issue. But it is clear that Heartwood's claims against Defendants did not sink to the level of being "merely founded on innuendo and suspicion."[18] *Robinson*, 2004 UT App 285, ¶ 24 n.3 (quotation simplified). In this case, while not prevailing on summary judgment, the record reflects sufficient facts such that we can conclude it was not wholly unreasonable to oppose summary judgment—even in the face of a significant uphill battle. Thus, the specific conduct here did not warrant rule 11 sanctions. As anemic as Heartwood's claims had become, those claims had not become plainly frivolous or completely lacking in evidentiary support.

¶40    Accordingly, we vacate the district court's imposition of sanctions against Heartwood.[19]


CONCLUSION

¶41    We affirm the district court's grant of summary judgment in favor of Defendants. In light of its designated representative's contradictory rule 30(b)(6) deposition testimony, Heartwood was not entitled to the reasonable inference it claimed should defeat summary judgment. We do not reach the merits of its breach-of-contract claim because Heartwood did not include the contract in question in the record and it did not carry its burden of persuasion on its claims for breach of the duties of

---

18. Furthermore, to its credit, Heartwood narrowed its claims against Defendants after determining, following discovery, that it could not factually support certain allegations it had made in its complaint.

19. We likewise deny Defendants' request for attorney fees incurred on appeal, premised on the theory that they were awarded fees below.

confidentiality and loyalty, which likewise preempted its claim for interference with contractual relations. But in light of the totality of the evidence Heartwood offered to oppose summary judgment, rule 11 sanctions were not appropriate and we reverse the district court's award of attorney fees to Defendants.

_____